Chase J. Potter
Texas Bar No. 24088245
Joshua L. Shepherd
Texas Bar No. 24058104
Anna Olin Richardson
Texas Bar No. 24102947
potter@imcplaw.com
shepherd@imcplaw.com
anna@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
214.432.1536

COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR THE TRUSTEE

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:**<br><br>**ANIMO SERVICES, LLC,**<br><br>**DEBTOR.** | §<br>§<br>§<br>§<br>§<br>§ | **Case No. 23-30035-mvl7**<br><br>**Chapter 7** |
| **AREYA HOLDER AURZADA, TRUSTEE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BLACKSTONE INVESTMENTS I, LTD.,**<br><br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 25-03017-mvl** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Pursuant to the Court-approved Agreement and Joint Prosecution Agreement,[1] GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, Areya Holder Aurzada (the "Trustee"), the duly-appointed Chapter 7 Trustee for the estate (the "Estate") of Animo Services, LLC (the "Debtor" or "ASL"), the debtor in the above-styled and numbered Chapter 7 bankruptcy case (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court" or the "Court"), files this *First Amended Complaint* (this "Amended Complaint") against Blackstone Investments I, Ltd. ("Defendant" or "Blackstone"). In support thereof, the Trustee respectfully shows as follows:

## I. SUMMARY

1. The Trustee seeks to avoid fraudulent transfers that occurred during the relevant clawback period (as discussed herein) prior to the Petition Date,[2] and recover such transfers from Blackstone (or from any other person or entity for whose benefit the transfers were made). Additionally, to the extent Blackstone has filed or asserted a claim against the Debtor or the Estate, the Trustee seeks to disallow that claim. The Trustee does not waive, and hereby reserves, all of her rights and the rights of the Debtor to object to any such claim by Blackstone, for any reason, including those reasons set forth in Sections 502(a) – (j) of the Bankruptcy Code.[3]

## II. JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter and the relief requested herein under 28 U.S.C. §§ 157(b) and 1334. This matter presents a core proceeding within the meaning of 28

[1] *See Motion to Approve Sale of Interests in Unencumbered Causes of Action Free and Clear of Interests* [Bankr. Dkt. No. 84] and the Court's *Order Approving Sale of Interests in Unencumbered Causes of Action Free and Clear of Interests* [Bankr. Dkt. No. 94].

[2] As defined herein.

[3] 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code").

U.S.C. § 157(b)(2), and this Court may enter final orders for the relief requested herein.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because the Debtor's Chapter 7 bankruptcy case is pending in this district and the causes of action asserted herein arise in, and are related to, that case.

4. The statutory and legal predicates for the relief sought herein are Sections 502, 544, 548, and 550 of the Bankruptcy Code, TEX. BUS. & COMM. CODE §§ 24.001, *et seq.* ("TUFTA"), and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III. PARTIES

5. The Trustee is the duly appointed Chapter 7 Trustee of the Debtor and the Estate, and, along with the Agent, pursuant to the Agreement and Joint Prosecution Agreement, files this Amended Complaint in such capacity.

6. Defendant Blackstone Investments I, Ltd. is a limited partnership organized and existing under the laws of the State of Texas. Pursuant to Fed. R. Bankr. P. 7004(b), Blackstone may be served with process in this adversary proceeding by and through its registered agent, Capitol Corporate Services, Inc., as follows: Blackstone Investments I, Ltd., c/o Capitol Corporate Services, Inc., Registered Agent, 1501 S. Mopac Expressway. Ste. 220, Austin, Texas 78746.

## IV. FACTUAL BACKGROUND

7. An involuntary petition for relief was filed against Debtor under Chapter 7 of the Bankruptcy Code on January 4, 2023 (the "Petition Date"). On February 9, 2023, the Bankruptcy Court entered its Order for Relief in an Involuntary Case [Bnky. Dkt. No. 12].

8. An affiliate of With Purpose, Inc. ("WPI"),[4] the Debtor operated under an umbrella of a multitude of its additional affiliates all doing business under the name "GloriFi." The business

[4] WPI is a debtor in its own Chapter 7 bankruptcy case which is also pending in this Court as Case No. 23-30246-mvl7.

as a whole was a finance technology start-up with the aim of developing a conservative financial platform. GloriFi was founded by Toby Neugebauer ("Neugebauer").[5]

9. GloriFi's mission was to ultimately offer checking and savings accounts, credit cards, mortgages, brokerage accounts, and insurance policies. With this financial platform, GloriFi worked to develop an integrated proprietary software system (the "Tech Stack"). It was intended that the customer-facing components of the Tech Stack would include an "app" for use with mobile devices, as well as a website that the Debtor planned to launch on March 31, 2022.

10. As part of the GloriFi start-up, the Debtor had immense promise. Unfortunately, GloriFi's history was marred by failed attempts to complete the financial platform and monetize the business due, in large part, to Neugebauer's (who also served as officer, director, and majority shareholder of WPI) breaches of fiduciary duty, self-dealing, and fraud. Almost immediately after inception, the Debtor faced one liquidity crisis after another.

***The Fraudulent Transfers***

11. During the two-year period preceding the Petition Date (the "2-Year Period"), the Debtor made transfer(s) of an interest of the Debtor's property to or for the benefit of Blackstone through payments totaling not less than $194,638.21 (collectively, the "Transfers").

12. Specifically, at the time of the Transfers, the Debtor maintained a bank account at Frost Bank with an account number ending in 2975. In December 2021 and February 2022, the Debtor made the following three transfers from its bank account to Blackstone's bank account at Frost Bank with an account number ending in 0119, totaling $194,638.21 (*i.e.*, the Transfers):

[5] GloriFi described itself as an "unapologetically pro-America, pro-freedom, pro-capitalism technology company, offering best-in-class financial products empowering members to put their money where their values are and preserve the Country they believe in."

a. December 17, 2021 – $135,216.86

b. December 31, 2021 – $55,261.98

c. February 7, 2022 – $4,159.33

13. At the time of the Transfers, Neugebauer – as the control person – controlled the financial affairs of the Debtor.

14. During the same time, Neugebauer also served as the managing member of Skytop Holdings, LLC ("Skytop"), which is the general partner of Blackstone. Neugebauer and his wife, Melissa Neugebauer, are limited partners of Blackstone. Upon information and belief, Neugebauer personally owns 44.5% of Blackstone, Neugebauer's wife owns another 44.5% of Blackstone, and the remaining owners of Blackstone are Neugebauer's family members or family-run companies. Neugebauer, however, personally directed and controlled the financial affairs of Blackstone at all relevant times. Unsurprisingly Blackstone's business address was the same as GloriFi's headquarters (*i.e.*, Neugebauer's mansion on Strait Lane in Dallas).

15. In the early days of GloriFi, Neugebauer claims he would sometimes use Blackstone to advance certain expenses on behalf of the Debtor and other entities under the GloriFi umbrella. For example, Neugebauer would direct Bryan Joiner ("Joiner"), the CFO of the Neugebauer family office, and others in his inner circle, to pay professional fees and purchase furniture, equipment, and software to purportedly benefit the various GloriFi entities, and Neugebauer would supposedly use Blackstone funds to do so. However, Neugebauer (and/or one of his agents, like Joiner) would keep the specifics of these purchases off the Debtor's books. As such, at the time of each of the Transfers, there was no indication the Debtor owed Blackstone any money (whether for advancing legitimate expenses or otherwise).

16. Nonetheless, on the date of each of the Transfers (or shortly before), Neugebauer directed substantial lump sums be "reimbursed" to Blackstone as "expenses" that Blackstone supposedly advanced for the Debtor (*i.e.*, the purported basis for the Transfers). Again, however, because these supposed "expenses" were not identified in the Debtor's financial records, the Debtor's employees who were asked to facilitate the Transfers had no way of checking the legitimacy of any supposed advancement of expenses by Blackstone on the Debtor's behalf.

17. Notably, in some of the Debtor's records, the Transfers are designated as "related party" transactions or "inter-company payables," whereas other records reflect the Transfers were for repayments of "loans" to the Debtor. By directing that the Transfers be given various designations in the Debtor's records, Neugebauer intentionally concealed the true nature of the Transfers (which, as set forth below, were to ensure his company, Blackstone, could promptly pay off the Neugebauer "Family Office Card").

18. Specifically, at the time of each of the Transfers, it appears Neugebauer and his family wanted cash to pay off their "Family Office Card." Neugebauer took the Debtor's funds, transferred them to Blackstone, and used those same funds to pay off the Neugebauers' Family Office Card via Blackstone (which was often used as a vehicle to pay off the Family Office Card and other Neugebauer "family" items that had no relation to the Debtor).

19. Moreover, at the time of the Transfers, it appears that Blackstone comprised of 10% or more of Neugebauer's and his wife's substantial net worth. Neugebauer therefore wanted to ensure that, at all relevant times, Blackstone had sufficient funds to support his and his family's extravagant lifestyle. In addition, because the directives to make the Transfers from the Debtor to Blackstone came directly from Neugebauer (who controlled the financial affairs of both the Debtor and of Blackstone), the GloriFi employees asked to facilitate the Transfers were simply expected

to accept Neugebauer's demands without question and execute them as instructed, or face repercussions.

20. Put simply, the Debtor and Blackstone were not mere strangers. At the time of the Transfers, they were both controlled by Neugebauer, and Neugebauer had sweeping authority to move money between the Debtor and Blackstone as he saw fit. The Transfers, however, were not the mere commingling of funds. Instead, Neugebauer—wanting to pay off his Family Office Card on the Debtor's dime—fabricated an excuse to transfer thousands of dollars from the Debtor to Blackstone under the guise of reimbursement of "expenses" or repayment of "loans." However, Blackstone's "expenses" or "loans" were not accompanied by promissory notes, did not bear interest, did not include a maturity date, and did not create any contractual or legal obligation of repayment. Further, with respect to the supposed reimbursement of professional fees that were the subject of one of the Transfers, there is no indication that the services provided by such professionals had anything to do with the Debtor. By later designating the Transfers as supposed repayment of "loans" or "expenses" (among other things), Neugebauer tried to conceal Blackstone's wrongful conduct.

***The Debtor was financially vulnerable both before and after the Transfers***

21. While the Debtor was formed in late May of 2021, it sat inactive until the latter part of the year. Woefully undercapitalized, and without any source of generating its own revenue, the Debtor continuously remained in a cash crunch. Unable to stand on its own, the Debtor relied on WPI for its financial stability – or lack thereof (*i.e.*, the vast majority of cash inflows into the Debtor originated from WPI). WPI, however, was under no obligation to continue to capitalize the Debtor and had its own financial problems.

22. The Debtor's financial struggles were evident in some of its earliest financial statements. For example, in an income statement dated October 8, 2021, the Debtor was shown to have already accumulated net income (a loss) of -$1,316,275.78.

23. The Debtor's financial records[6] reveal that, as of November 20, 2021, the Debtor had total assets of $991,283.00, with total liabilities of $1,168,813.00. From a market value perspective, this financial vulnerability and/or insolvency was actually deeper than it appeared, as $773,748.00 of "assets" took the form of "software in process." While this looks nice on a balance sheet, in reality, the "software in process" – the Tech Stack – never came to complete fruition. Thus, this "software in process" cannot be considered when determining financial vulnerability (including insolvency) in the context of the fraudulent transfer analysis.[7]

24. On or about December 3, 2021, the Debtor's Chief Financial Officer, Jonathan Pennington ("Pennington"), indicated that he was processing a transfer of $3 million from WPI to the Debtor. Despite this significant sum of money, Pennington only expected "…this transfer to cover anticipated expenses and payroll through the month of December."

25. On December 17, 2021, the Debtor transferred $135,216.90 to Blackstone (the "$135,216.90 Transfer"). This payment to Blackstone only caused the Debtor further financial distress, and, as discussed above, this Transfer was not made in exchange for Blackstone providing

---

6 On or about February 15, 2022, WPI's Director of Accounting circulated the completed 2021 year-end financials to the Debtor's outside accountants.

7 The Court has already considered evidence supporting this conclusion, including but not limited to: (i) evidence that "[a]t a board meeting on June 30, 2022, Mr. Kang, [WPI]'s chief operating officer, 'opined that the tech stack is not transferable because it is a bespoke development.' [WPI Bankr. Dkt. No. 563, p. 40 of 97]; and (ii) finding that Trustee's expert "Mr. Crawford credibly testified that there is a preconception that such uncompleted software should be valued at **zero**." (*emphasis in original*) [Bankr. Dkt. No. 563, p. 37 of 97]. Thus, even though the Tech Stack certainly may have had "value" for purposes of valuing the GloriFi enterprise on a go forward basis in the event of a business combination (*e.g.*, GloriFi's contemplated de-SPAC transaction), the Debtor was financially vulnerable and/or insolvent at or near the time of the transfers at issue in this lawsuit as discussed herein.

reasonably equivalent value. Just days later, on or about December 20, 2021, Pennington internally circulated a year-to-date income statement which reflected that the Debtor's accumulated net income (loss) was now at -$9,939,502.00. In addition to this income statement, Pennington also circulated the year-to-date balance sheet for WPI. This balance sheet reflected that WPI was financially vulnerable as of December 20, 2021, with its total liabilities ($53,398,320.00) exceeding its assets ($52,227,002.00).

26. And it only got worse. Eight days later, on or about December 28, 2021, WPI's Director of Accounting, Gardner Bell ("Bell"), circulated an updated year-to-date balance sheet for WPI to Pennington and Joiner, which now reflected WPI's increasing financial vulnerability, with total liabilities increased to $53,685,719.28 and assets decreased to $51,486,938.72.

27. The Debtor's balance sheet from the "Year-End Financials" reflected non-"software in process" assets in the total amount of $2,380,320.72. Liabilities, on the other hand, were almost double this amount – $4,442,915.43. Of these liabilities, accrued and unpaid expenses – in large part due and owing to unsecured vendors – totaled $4,438,756.10. As such, the Debtor was also financially vulnerable and/or insolvent as of December 31, 2021.

28. In turn, WPI, the parent that the Debtor looked for to provide its "allowance," continued dealing with its own financial vulnerability. As of December 31, 2021, WPI's balance sheet reflected total assets of $52,127,041.93, while having total liabilities of $54,203,921.18.

29. Despite Debtor's floundering financial position, on New Year's Eve 2021, the Debtor transferred $55,261.98 to Blackstone (the "$55,261.98 Transfer").

30. On or about January 10, 2022, Pennington acknowledged to the Debtor's outside accountants that, as to both the Debtor and WPI, "… we will be in the 'no-revenue' phase until probably April of 2022." Nonetheless, and with what was clearly an unreasonably small amount

of capital, the Debtor pushed forward in incurring debts that were clearly beyond its ability to pay timely.

31. Evidencing this fact, on January 14, 2022, Pennington e-mailed Neugebauer that:

> Based on invoices received, payroll processed and estimated expenses, we need to transfer $7.5MM of cash from the operating accounts from With Purpose, Inc. to Animo Services.

32. On February 7, 2022, the Debtor transferred $4,159.33 to Blackstone (the "<u>$4,159.33 Transfer</u>"). As discussed above, the Debtor did not receive reasonably equivalent value in exchange for this transfer to Blackstone. On February 22, 2022, Bell emailed Pennington and Joiner, regarding yet another liquidity crisis, acknowledging that the Debtor had incurred debts beyond its ability to pay:

> Based on my current cash projection below, I'm making a capital call of $5,000,000 from With Purpose Inc. to Animo Services LLC. Would you please review and elevate to Toby for approval if you agree with these projections?
>
> - ~$1MM Payroll estimate (next 3 cycles):
>   - Feb 25th $315,000
>   - March 11th $335,000
>   - March 25th $350,000
> - ~$4MM Invoice estimate:
>   - ~$2.5MM for unpaid invoices at Animo Services LLC
>     - $2.2MM of that is concentrated within KPMG, EastBanc, MBO, and Micro Focus
>   - ~1.5MM for 2 larger invoices budgeted in February but not yet received ($750k Lexis Nexis & $800k Unqork)
> - **Total Call of $5,000,000**

In response, Joiner acknowledged the Debtor's woeful undercapitalization resulting in a continuous need for cash handouts:

> Thanks Gardner! Is this proposed through March? I thought we would be close to out of current cash by end of march?

33. In short succession thereafter, the Debtor continued making payments to certain vendors, which led to yet another liquidity crisis. Specifically, on March 16, 2022, Bell sent the following email internally with the subject line "ASL Capital Call – urgent":

> Based on my current cash projection below, I'm making a capital call of $3,500,000 from With Purpose Inc. to Animo Services LLC. Would you please review and elevate to Toby for approval if you agree with these projections?
>
> Once we pay invoices received and run payroll on March 25th, we will have less than $1MM between the two accounts.

| Animo Services LLC | | With Purpose Inc. | |
|---|---|---|---|
| 545 | Current Balance | 4,900 | Current Balance |
| (378) | MBO invoice due today | (729) | WPI Invoices outstanding |
| (515) | March 25th payroll | (350) | March 25th payroll |
| (2,622) | ASL invoices outstanding* | (3,500) | Capital Call |
| 3,500 | Capital Call | | |
| 530 | Remaining Balance | 321 | Remaining Balance |

*in thousands (000s)*

**Excludes MBO invoice due today, but includes all invoices due beginning next week and beyond.*

34. In response, Joiner forwarded the email to Neugebauer stating:

> Toby,
>
> See below. We have approximately 9 days of cash flow remaining.

35. On March 21, 2022, Bell internally circulated a report entitled "Cash Balances and Top 15 Unpaid Invoices *as of 3/18/22*." This report showed that the Debtor had a $3,461,000.00 cash balance, but also that 12 of the top 15 *unpaid* invoices across all the GloriFi entities belonged to the Debtor and totaled $3,314,000.00. While this left a cash balance of $147,000.00, it also did not account for invoices that fell outside the "top 15" nor the expense of the Debtor's payroll, which was historically high (*see* Bell's March 16, 2022, e-mail, above). Thus, the Debtor's debts/obligations exceeded its cash on hand.

36. The next day, a "Balance Sheet Reconciliation Package" for both the Debtor and WPI were circulated for Bell's review. Each package purportedly reconciled that entity's books for the first quarter of 2022. In its package, the Debtor's balance sheet reflects that, as of March 31, 2022, after omitting "Total Software in Process," the Debtor was insolvent in the amount of $488,480.24. Further, this balance sheet reflected the Debtor's accrued and unpaid expenses to be $2,864,800.96, stemming from the Debtor's failure to pay no less than 20 different vendors as well as various payroll expenses.

37. Following these quarterly reports, on April 4, 2022, Bell circulated an e-mail internally which stated:

> Cash levels
> - We are monitoring cash levels very closely and have placed all vendor payments on hold
> - Unless cash comes in Tues/Wed, we will need to move money between accounts (WPI, ASL, MGA) to cover payroll at the various entities

Further, attached to this email was an updated report entitled "Cash Balances and Top 15 Unpaid Invoices *as of 3/31/22*." This latest report showed that the Debtor was down to a cash balance of $1,414,000.00, and that 9 of the top 15 *unpaid* invoices across all entities belonged to the Debtor, totaling $2,963,000. This reflected an insolvency in the amount of $1,549,000.00 and again did not account for invoices outside the "top 15" or the expense of the Debtor's payroll.

38. On April 15, 2022, Bell sent an email internally which once again evidenced the fact that the Debtor was engaged in a business where the remaining property constituted unreasonable capital, and that the Debtor continued to incur debts that were beyond its ability to pay:

> Please see the budget to actual reporting for the week ending 4/15/22. Cash levels remain low, while high volumes of invoices continue to come in. I know that funding is in process but for transparency, I wanted to call out the vendors who have large invoices due this week that will not be paid. Let me know if you have any questions.

Bell's email also attached a new version of the prior cash balances report, titled "Cash Balances and Top 15 Unpaid Invoices *as of 4/15/22*." This updated report emphasized the Debtor's continued cash burn. The Debtor was shown to have a cash balance of only $297,000.00, while having outstanding balances of at least $3,076,000.00. This left a substantial deficiency of $2,799,000.00.

39. The Debtor turned to its GloriFi affiliates to play the shell game of money transferring it had grown accustomed to and, indeed, relied upon. On April 26, 2022, in response to internal communications between the GloriFi entities regarding transfers of funds between the entities, Pennington acknowledged that:

> We have existing vendor invoices for GloriFi And Animo Services that are a couple of weeks past due and several of those are integral to day 1 operation.
> We are in an unfortunate situation and I really wish we were not.

40. All told, the Debtor was financially vulnerable both before and after each of the Transfers.

## V. <u>CLAIMS FOR RELIEF</u>

### A. COUNT I: Avoidance of Transfer – Actual Fraudulent Transfer (11 U.S.C. § 548(a)(1)(A))

41. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth herein.

42. The Transfers represent the transfer of interests of the Debtor in property.

43. Blackstone is the initial transferee of the Transfers. Blackstone did not receive the Transfers in good faith, did not take them for value, and did not take them without knowing their voidability.

44. The Transfers were made with the intent to hinder, delay, or defraud any entity to which the Debtor was indebted (such as vendor Transmit Security, Inc., as one example, whose proof of claim arises from a September 30, 2021, contract with the Debtor), or thereafter became indebted on or after the date such Transfers were made.

45. Numerous badges of fraud are present with respect to the Transfers. First, Blackstone was an insider of the Debtor. Second, at the time of the Transfers, Blackstone knew the Debtor had no operating revenue and would be unable to pay debts it was incurring. Third, the Debtor was either insolvent or became insolvent shortly after each Transfer was made. Fourth, Blackstone provided no specific services, work, or other value to the Debtor that could possibly support the Transfers.

46. The Trustee therefore pleads that the Transfers were actual fraudulent transfers because (for the reasons set forth above) the Debtor made the Transfers with the actual intent to hinder, delay, or defraud creditors. As such, the Transfers are avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

**B. COUNT II: Avoidance of Transfer – Actual Fraudulent Transfer (TEX. BUS. & COM. CODE § 24.005(a)(1))**

47. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth herein.

48. The Trustee also pleads that the Transfers were actual fraudulent transfers under TUFTA § 24.005(a)(1).

49. At the time of the Transfers, and as reflected on the Debtor's financial statements, the Debtor had multiple unsecured creditors who were owed money (including, but not limited to Transmit Security, Inc.). Unsurprisingly, some of these creditors were still owed by the Debtor on the Petition Date (*e.g.,* Transmit Security, Inc.), as reflected in part by the Debtor's claims register

in the underlying bankruptcy case. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of and may avoid, the Transfers under TUFTA.

50. For the same reasons the Transfers are fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code, the Transfers are also actual fraudulent transfers under Section 24.005(a)(1) of TUFTA. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to her reasonable costs and attorneys' fees in avoiding and recovering the Transfers.

**C. COUNT III: Avoidance of Transfers as Constructively Fraudulent Transfers Under the Bankruptcy Code (11 U.S.C. § 548 (a)(1)(B))**

51. The Trustee hereby incorporates all foregoing and ensuing facts and allegations as if set forth herein.

52. As set forth above, the Debtor transferred $194,638.21 to Blackstone—$135,216.90 on December 17, 2021, $55,261.98 on December 31, 2021, and $4,159.33 on February 7, 2022.

53. Therefore, prior to the Petition Date, the Debtor made each of the Transfers of an interest in the Debtor's property (*i.e.*, cash), to or for the benefit of Blackstone, through payments totaling not less than $194,638.21.

54. The Debtor received no value in connection with the Transfers (much less reasonably equivalent value), as there is no indication that Blackstone performed any specific services for the Debtor at the time of each of the Transfers that would possibly support such Transfers. Meanwhile, at all relevant times before and after the Transfers were made, as detailed at length above, the Debtor was either insolvent, otherwise financially vulnerable, or incurring debts that it was unable to pay as they became due. The Debtor's claims register in the underlying

bankruptcy case, for example, reflects unsecured claims against the Debtor exceeding $46 million as of February 19, 2025, including Transmit Security, Inc.'s proof of claim.

55. The Trustee therefore pleads that the Transfers were constructively fraudulent transfers. As such, the Transfers are avoidable under 11 U.S.C. § 548(a)(1)(B) because (for the reasons set forth above) the Debtor received no value (much less reasonably equivalent value) in exchange for the Transfers, and the Debtor (i) was insolvent at the time of the Transfers, (ii) became insolvent as a result of the Transfers, (iii) was engaged in business for which its remaining property constituted unreasonably small capital, or (iv) it intended to incur, or believed the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

**D. COUNT IV: Avoidance of Transfer – Constructive Fraudulent Transfer (TEX. BUS. & COM. CODE § 24.005(a)(2))**

56. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth herein.

57. The Trustee also pleads that the Transfers were constructive fraudulent transfers under TUFTA § 24.005(a)(2).

58. As set forth above, the Debtor transferred $194,638.21 to Blackstone—$135,216.90 on December 17, 2021, $55,261.98 on December 31, 2021, and $4,159.33 on February 7, 2022.

59. Therefore, prior to the Petition Date, the Debtor made each of the Transfers of an interest in the Debtor's property (*i.e.*, cash), to or for the benefit of Blackstone, through payments totaling not less than $194,638.21.

60. The Debtor received no value in connection with the Transfers (much less reasonably equivalent value), as there is no indication that Blackstone performed any specific services for the Debtor at the time of each of the Transfers that would possibly support such

Transfers. Meanwhile, at all relevant times before and after the Transfers were made, as detailed at length above, the Debtor was either insolvent, otherwise financially vulnerable, or incurring debts that it was unable to pay as they became due. The Debtor's claims register in the underlying bankruptcy case, for example, reflects unsecured claims against the Debtor exceeding $46 million as of February 19, 2025, including Transmit Security, Inc.'s proof of claim.

61. Pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a pre-petition transfer by the Debtor that an unsecured creditor could avoid.

62. The Trustee therefore pleads that the Transfers were constructive fraudulent transfers under TUFTA because (for the reasons set forth above) the Debtor received no value (much less reasonably equivalent value) in exchange for the Transfers, and the Debtor (i) was engaged in business for which its remaining property constituted unreasonably small capital, or (ii) intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

63. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to her reasonable costs and attorneys' fees in avoiding and recovering the Transfers.

**E. COUNT V: Recovery of Voidable Transfer (11 U.S.C. § 550)**

64. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth herein.

65. As set forth above, the Debtor transferred $194,638.21 to Blackstone—$135,216.90 on December 17, 2021, $55,261.98 on December 31, 2021, and $4,159.33 on February 7, 2022.

66. Blackstone was the initial transferee of the Transfers, or the immediate or mediate transferees of such initial transferee, or the Transfers were made for Blackstone's benefit.

67. The Debtor had a continuous history of incurring debts that it had no ability to pay, including debts owed to a multitude of vendors. At the time of each of the Transfers, the Debtor had multiple unsecured creditors that were ultimately allegedly owed millions of dollars (as reflected on the Debtor's balance sheets and other financial statements). Unsurprisingly, multiple of these unsecured creditors were still owed by the Debtor on the Petition Date, as reflected, in part, by the Debtor's claims register in the underlying Bankruptcy Case (such as vendor Transmit Security, Inc., as one example, whose proof of claim arises from a September 30, 2021, contract with the Debtor). Pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a pre-petition transfer by the Debtor that any of these unsecured creditors could avoid.

68. Pursuant to Section 550 of the Bankruptcy Code, the Trustee is entitled to recover the Transfers, in the total amount of $194,638.21, and hereby seeks a money judgment against Blackstone in at least that amount.

**F. COUNT VI: Disallowance of Claim (11 U.S.C. § 502)**

69. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth herein.

70. As set forth above, the Debtor transferred $194,638.21 to Blackstone—$135,216.90 on December 17, 2021, $55,261.98 on December 31, 2021, and $4,159.33 on February 7, 2022. However, the Debtor received no value in exchange for the Transfers. Meanwhile, at the time of the Transfers, the Debtor was insolvent or otherwise financially vulnerable.

71. Blackstone is the transferee of the Transfers, which are avoidable as stated herein. As such, the Transfers are recoverable pursuant to Section 550 of the Bankruptcy Code.

72. Blackstone has not paid back any portion of the Transfers.

73. Accordingly, pursuant to Section 502(d) of the Bankruptcy Code, any Claim[8] that Blackstone and/or its assignees may have against the Debtor or the Estate must be disallowed.

74. Moreover, pursuant to Section 502(j) of the Bankruptcy Code, any Claim that Blackstone and/or its assignees may have against the Debtor or the Estate which may have been previously allowed in the Bankruptcy Case must be reconsidered and disallowed until such time Blackstone pays to the Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon.

75. If Blackstone fails to pay the Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon, the Trustee hereby requests that the Bankruptcy Court disallow all Claims of Blackstone.

**G. COUNT VII: Pre-Judgment Interest, Attorneys' Fees, and Expenses**

76. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth herein.

77. The Trustee is also entitled to recover pre-judgment interest at the federal post-judgment rate from the date of the Transfers until the date of the judgment.

78. The Trustee is also entitled to recover her reasonable costs and attorneys' fees in avoiding and recovering the Transfers pursuant to Section 24.013 of TUFTA.

---

[8] As that term is defined in Section 101(5) of the Bankruptcy Code.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court render judgment for the Trustee and against Defendant as follows:

(i) avoidance of the Transfers under the Bankruptcy Code and TUFTA as fraudulent transfers;

(ii) recovery of the Transfers by way of money judgment against the Defendant;

(iii) Judgment against Defendant for Debtor's actual, compensatory, and consequential damages;

(iv) reasonable attorneys' fees and costs;

(v) pre-judgment interest and post-judgment interest at the highest rate allowed by law;

(vi) disallowance of any claim that Blackstone and/or its assignees may have against the Debtor or the Estate which may have been previously allowed in the Bankruptcy Case; and

(vii) such other and further relief, at law or in equity, to which the Trustee may be entitled.

Respectfully submitted,

*/s/ Chase J. Potter*

**CHASE J. POTTER**
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com
**JOSHUA L. SHEPHERD**
Texas Bar No. 24058104
E-Mail: shepherd@imcplaw.com
**ANNA OLIN RICHARDSON**
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone: (214) 432-1536

**COUNSEL FOR THE AGENT AND SPECIAL COUNSEL FOR THE TRUSTEE**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system on the 7th day of April, 2026.

*/s/ Chase J. Potter*

**CHASE J. POTTER**